UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

U.S. DISTRICT COURT
EASTERN DISTRICT-WI
FILED
2013 MAY 28 P 4: 4
JON W. SANFILIPPO
CLERK

---

UNITED STATES OF AMERICA, and
The STATE OF WISCONSIN, ex rel.
and ROBERT W. NINNEMAN, M.D., and
LISA A. BARATTA, M.D., individually,

Plaintiffs,

**FILED *IN CAMERA* AND UNDER SEAL**

vs.

Civil Action No.: 13-C-0591

AURORA HEALTH CARE METRO, INC.,
d/b/a ST. LUKE'S MEDICAL CENTER, a
WISCONSIN CORPORATION, and

AURORA MEDICAL GROUP, INC. a
WISCONSIN CORPORATION, and

AURORA CARDIOVASCULAR SERVICES,
an ENTITY OF AURORA MEDICAL GROUP, INC.,
and

DR. ANJAN GUPTA, M.D., individually, and

Dr. TANVIR BAJWA, M.D., individually.

Defendants.

**COMPLAINT FOR VIOLATION OF THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§3729 - 3732 AND WISCONSIN FALSE CLAIMS ACT §20.931**

Pursuant to 31 U.S.C. §3730(b)(1) and Wis. Stats. §20.931, plaintiffs Robert W. Ninneman, M.D. and Lisa A. Baratta, M.D. ("Relators") for themselves and on behalf of the United States of America and the State of Wisconsin, by their attorneys Gimbel, Reilly, Guerin & Brown LLP, brings this civil action under the Federal False Claims Act, 31 U.S.C. §3729, *et seq.*, and Wis. Stats. §20.931, *et seq.*, and under common law theories of payment by mistake and unjust enrichment, and allege as follows:

**FILING UNDER SEAL**

1. Under the Act, this complaint is to be filed *in camera* and remain under seal for a period of at least sixty (60) days and shall not be served on defendants until the Court so orders. The Government may elect to intervene and proceed with the action within sixty (60) days after it receives both the complaint and the material evidence and information.

**JURISDICTION AND VENUE**

2. This action arises under 31 U.S.C. §3729 *et seq.*, also known as the Federal False Claims Act (the "Act"), and the common law theories of payment by mistake and unjust enrichment to recover treble damages and civil penalties on

behalf of the United States of America arising out of the Defendant's submission of fraudulent claims for payment to the United States Government through Medicare.

3. This action also arises under Wis. Stats. §20.931 *et seq.*, also known as the Wisconsin False Claim Law (the "Law"), and the common law theories of payment by mistake and unjust enrichment to recover treble damages and civil penalties on behalf of the State of Wisconsin arising out of the defendants submission of fraudulent claims for payment to the State of Wisconsin through Medicaid.

4. Section 3732 of the Act provides that this Court has exclusive jurisdiction over actions brought under the Act and concurrent jurisdiction over state claims arising from transactions giving rise to the claims under the Act. In addition, jurisdiction over this action is conferred on this Court by 28 U.S.C. §1345 and 28 U.S.C. §1331 because this civil action arises under the laws of the United States.

5. Venue is proper in this district pursuant to 28 U.S.C. §1391 and §3732(a) of the Act, which provides that "any action under section 3730 may be brought in any judicial district in which the Defendant or, in the case of multiple Defendants, any one Defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred."

6. Defendant Aurora Health Care Metro, Inc., d/b/a St. Luke's Medical

Center, is a Wisconsin corporation that transacts business within the State of Wisconsin and within this judicial district, with its principal place of business being located at 2900 West Oklahoma Avenue, Milwaukee, Wisconsin 53215.

7. Defendant Aurora Medical Group, Inc. is a Wisconsin corporation that transacts business within the State of Wisconsin and within this judicial district, with its principal place of business being located at 3000 West Montana Street, Milwaukee, Wisconsin 53215.

8. Defendant Aurora Cardiovascular Services, an entity of Aurora Medical Group, Inc. is a Wisconsin corporation that transacts business within the State of Wisconsin and within this judicial district, with its principal place of business being located at 2801 West Kinnickinnic River Parkway, Suite 777, Milwaukee, Wisconsin 53215.

9. Defendant Anjan Gupta, M.D. is a physician licensed in Wisconsin and an employee of Aurora Medical Group, Inc. and Aurora Cardiovascular Services that transacts business within the State of Wisconsin and within this judicial district, with his principal place of business being located at 2801 West Kinnickinnic River Parkway, Suite 777, Milwaukee, Wisconsin 53215.

10. Defendant Tanvir K. Bajwa, M.D. is a physician licensed in Wisconsin and an employee of Aurora Medical Group, Inc. and Aurora Cardiovascular Services that transacts business within the State of Wisconsin and within this judicial

district, with his principal place of business being located at 2801 West Kinnickinnic River Parkway, Suite 777, Milwaukee, Wisconsin 53215.

## CONFIDENTIAL DISCLOSURE STATEMENT

11. As required under §3730(a)(2) of the Act, Relators Ninneman and Baratta have provided to the Attorney General of the United States and to the United States Attorney for the Eastern District of Wisconsin, simultaneous with, or prior to the filing of this complaint, a statement of all material evidence and information related to the complaint (the "Disclosure Statement").

## PARTIES TO THE ACTION

12. Plaintiff United States of America, through the Department of Health and Human Services ("HHS") and the Health Care Financing Administration ("HCFA"), administers a Supplementary Medical Insurance Program for the Aged and Disabled, established by Part B, Title XVIII, of the Social Security Act, 42 U.S.C. §1395(j), *et seq.*, ("Medicare"). Medicare is a federal health insurance program that serves people age 65 or older, as well as certain disabled individuals.

13. Plaintiff State of Wisconsin, through the Wisconsin Department of Health and Family Services, administers the Medicaid program that provides health coverage to some low-income Wisconsin residents, families with children and

pregnant women, medically needy individuals, the elderly, and people with disabilities, if state and federal guidelines are met.

14. Relator Robert W. Ninneman, M.D., ("Relator Ninneman") is a United States citizen and resident of the State of Wisconsin, and brings this action on behalf of the United States of America pursuant to 31 U.S.C. §3730(b)(1) and State of Wisconsin pursuant to Wis. Stats. §20.931, et seq. Relator Ninneman is employed by the defendants, Aurora Medical Group, Inc. (AMG) and Aurora Cardiovascular Services (ACS), for a period of approximately twenty-two (22) years, employed for the purposes of providing services including interventional cardiovascular services and treatment of cardiovascular disease. Relator Ninneman brings this action based on direct and independent knowledge acquired through his employment with defendants Aurora Health Care Metro, Inc., d/b/a Aurora St. Luke's Medical Center (ASLMC), Aurora Medical Group, Inc. (AMG) and Aurora Cardiovascular Services (ACS), and is an original source of the allegations.

15. Relator Lisa M. Baratta, M.D., ("Relator Baratta") is a United States citizen and resident of the State of Wisconsin, and brings this action on behalf of the United States of America pursuant to 31 U.S.C. §3730(b)(1) and State of Wisconsin pursuant to Wis. Stats. §20.931, et seq. Relator Baratta is employed by the defendants, Aurora Medical Group, Inc. (AMG) and Aurora Cardiovascular

Services (ACS), for a period of approximately eleven (11) years, employed for the purposes of providing services including treatment of cardiovascular disease, echocardiography and nuclear cardiology. Relator Baratta brings this action based on direct and independent knowledge acquired through her employment with defendants Aurora Health Care Metro, Inc., d/b/a Aurora St. Luke's Medical Center (ASLMC), Aurora Medical Group, Inc. (AMG) and Aurora Cardiovascular Services (ACS), and is an original source of the allegations.

16. Defendant Aurora Health Care Metro, Inc., d/b/a Aurora St. Luke's Medical Center ("ASLMC"), is a Wisconsin entity that operates the hospital of the same name. ASLMC, through its medical staff office, reviews and conducts peer review of the services provided and procedures performed by physicians at the facility. ASLMC's principal place of business is located at 2900 W. Oklahoma Avenue, Milwaukee, Wisconsin 53215.

17. Aurora Cardiovascular Services (ACS) is a Wisconsin entity that employs and directs the services provided by cardiovascular physicians and staff throughout the Aurora Health system. ACS is the entity responsible for the hiring, firing and retention of cardiologists that provide health care services throughout the Aurora system. ACS controls the scheduling of support personnel, the operation of the catheterization lab and the assignments of health care providers in both inpatient and clinical office settings. As a result of those

functions, ACS has the data available to determine if physicians' perform unnecessary procedures, improperly utilize support personnel and falsely claim that services were physician-provided in order to receive reimbursement from government health care programs. ACS is a division of Aurora Medical Group Inc., with its principal place of business located at 2801 West Kinnickinnic River Parkway, Suite 777, Milwaukee, Wisconsin 53215.

18. Aurora Medical Group, Inc. (AMG) is a Wisconsin entity that employs the physicians' who provide services through the Aurora system. AMG receives the CPT coding data generated by ACS concerning health services performed by all physicians in the Aurora Health System. AMG is responsible for submitting bills to Medicare and Medicaid providers for reimbursement from government health programs. AMG receives whatever profits ACS generates above and beyond those monies returned to ACS as spelled out by its contract with AMG. AMG principal place of business is located at 3000 West Montana Street, Milwaukee, Wisconsin 53215.

19. Tanvir Bajwa M.D. is a physician, licensed to practice medicine in the State of Wisconsin. Dr. Bajwa is a graduate of King Edward Medical College and completed residencies at the Harlem Hospital Center in New York in psychiatry and St. Mary's Hospital in Milwaukee in internal medicine. Dr. Bajwa is Board certified in cardiovascular diseases, internal medicine and interventional

cardiology by the American Board of Internal Medicine. Dr. Bajwa practices interventional cardiology medicine at Aurora St. Luke's Medical Center (ASLMC) and is an employee of ACS and AMG. Dr. Bajwa's principal place of business is located at 2801 West Kinnickinnic River Parkway, Suite 777, Milwaukee, Wisconsin 53215.

20. Anjan Gupta M.D. is a physician licensed to practice medicine in the State of Wisconsin. Dr. Gupta is a graduate of Calcutta Medical College and served his residency at the Cleveland Clinic Foundation in internal medicine. Dr. Gupta is Board certified in cardiovascular disease and interventional cardiology by the American Board of Internal Medicine. Dr. Gupta practices interventional cardiology medicine at Aurora St. Luke's Medical Center (ASLMC) and is an employee of ACS and AMG. Dr. Gupta's principal place of business is located at 2801 West Kinnickinnic River Parkway, Suite 777, Milwaukee, Wisconsin 53215.

## FACTUAL BACKGROUND

21. **Cardiology and Cardiovascular Interventional Procedures**

a. Atherosclerosis is the process by which plaque builds up in the arteries. The coronary arteries supply blood to the heart and can become narrowed or blocked by this accumulation, a condition referred to as coronary artery disease. When the plaque narrows the artery, it is referred to as stenosis. Myocardial ischemia, or lack of blood flow and oxygen to the heart, can result

from this narrowing and can be associated with chest pain or discomfort referred to as angina.

b. Cardiologists perform a variety of testing to assess, treat, and diagnose patients with suspected heart-related issues, including coronary artery disease. Preliminary testing includes procedures such as a history and physical, electrocardiogram, echocardiogram, stress testing, nuclear stress testing and blood work. More invasive testing involves catheter-based procedures such as angiograms (also referred to as caths). Based on the results of these tests, cardiologists make recommendations for treatment including, but not limited to, no treatment necessary, a change in lifestyle choices, medical therapy, balloon angioplasty and stenting, and coronary artery bypass graft surgery.

c. Coronary angiography (also referred to as a cath), is an invasive diagnostic procedure that involves a two dimensional x-ray of the heart's blood vessels. The cardiologist begins the procedure by putting a catheter into an artery in a patient's leg. The catheter is then advanced through the vessel towards the heart, a contrast medium is injected, and pictures are taken. The pictures are referred to as angiograms. Coronary angiography involves the risk of serious bodily injury, including stroke, myocardial infarction, arrhythmia, renal complications, perforation of the artery, perforation of the heart chamber, and the risk of death. Angiography can also be used to view other arteries in

the body such as the renal arteries, iliac arteries, and subclavian arteries.

d. Angioplasty is a medical procedure used to restore blood flow through a narrowed artery. During angioplasty a catheter with a balloon is threaded through an artery in the groin up to the site of the narrowing. Once in place, the balloon is then inflated to push the plaque outward against the wall of the artery, widening the artery and restoring the flow of blood through it. Typically, during balloon angioplasty a stent is placed at the site of the narrowing. A stent is a small wire mesh tube that is placed within a coronary, or other type of artery, at the site of the narrowing to keep the vessel open. The stent is usually placed at the tip of the catheter, over the balloon. The balloon is then inflated, which causes the stent to expand. Once the stent is open, the balloon is deflated and removed. The stent is then left behind to hold the artery open. This procedure is performed by the cardiologist in the catheterization lab (cath lab). Risks associated with angioplasty include risk of serious bodily injury and death.

e. After a stent is placed in an artery, restenosis can occur. Restenosis occurs when scar tissue forms inside or near the stent, causing the vessel to become blocked again. Doctors refer to this as "in-stent restenosis". Restenosis results in additional interventional procedures being performed to treat the restenosis.

22. Interventional cardiologists, unlike most other physicians, are their own primary source of referrals for future medical procedures. Cardiologists take patients' history, conduct diagnostic tests, interpret test results and decide on treatment options largely unfettered by interjected opinions or assessments of other physicians. Once invasive procedures such as angioplasty and stenting are undertaken, the recipient becomes a cardiac patient for life with an increased likelihood for future invasive procedures. Invasive cardiac procedures, where not warranted by significant ischemic disease, are harmful to the recipient patient and contrary to a reasonable standard of care.

23. **Clinic and Inpatient Medical Examinations and Evaluations**

a. Payment for clinic, outpatient and inpatient services that are reimbursable through a healthcare benefit program are identified by multiple CPT coding criteria, established by the American Medical Association's Current Procedural Technology Code book ("CPT"), each consisting of specific requirements of care by a physician.

b. An office or other outpatient visit for the evaluation and management of a new patient requires these three key components: a detailed or comprehensive history; a detailed or comprehensive examination; and medical decision making of low to high complexity. Counseling and/or coordination of care with other physicians, other qualified health care professionals, or agencies

are provided consistent with the nature of the problem(s) and the patient's and/or family's needs.

c. Usually, the presenting problem(s) are of moderate to high severity. Typically, 30 to 60 minutes are spent face-to-face with the patient and/or family.

d. Inpatient consultations for new and established patients also have required components for reimbursement.

e. An inpatient consultation for a new or established patient requires these three key components: an expanded problem focused or detailed history; an expanded problem-focused or detailed examination; and straightforward medical decision-making ranging from low to moderate complexity. Counseling and/or coordination of care with other physicians, other qualified health care professionals, or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs.

f. Usually, the presenting problem(s) are of low to moderate severity. Typically, 40 to 80 minutes are spent at the bedside and on the patients hospital floor or unit.

g. Subsequent hospital care and observation, which is undertaken by the admitting physician or physicians on call for coverage of group patients, have additional criteria for payment of services.

h. Subsequent hospital care, for the evaluation and management of a

patient, on a daily basis, requires at least two of these three key components: an expanded or detailed problem-focused interval history; an expanded or detailed problem focused examination; medical decision-making of moderate to high complexity. Counseling and/or coordination of care with other physicians, other qualified health care professionals, or agencies are provided consistent with the nature of the problem(s) and the patients and/or familys needs.

i. Subsequent hospital care is usually necessary when the patient is responding inadequately to therapy or has developed a minor or significant complication or a significant new problem. Typically, 25 to 20 minutes are spent at the beside and on the patients hospital floor or unit.

j. Initial hospital care for the evaluation and management of a patient, on a daily basis, requires these three key components: a detailed or comprehensive history; a detailed or comprehensive examination; and, medical decision-making that is straightforward or of low to high complexity. Counseling and/or coordination of care with other physicians, other qualified health care professionals, or agencies are provided consistent with the nature of the problem(s) and the patients and/or familys needs.

k. Problem(s) requiring hospital admission are usually of low to high severity. Typically, 30 to 70 minutes are spent at the bedside and on the patients hospital floor or unit.

24. Upon information and belief of the Relators, Bajwa and Gupta routinely scheduled 50 – 70 office/clinic patient examinations per one-half day at ACS. Bajwa and Gupta do not have staff Nurse Practitioners or Physician Assistants to perform medical examinations that would be subject to reimbursement by Healthcare Benefit Programs. Patients are routinely seen by Registered Nurses, whose care is not reimbursable under these programs.

25. Upon information and belief of the Relators, the Aurora entities have knowledge of the aforementioned false claim activity of Bajwa and Gupta. The Aurora entities have knowledge of billings by and reimbursements for both Bajwa and Gupta for cath lab procedures and patient encounters. The Aurora entities assign their support personnel and schedule their activities during the same period of time Bajwa and Gupta are allegedly seeing patients in the clinic or conducting patient rounds. The Aurora entities have knowledge that Bajwa and Gupta perform more interventional procedures than other cardiologists and that for years they have been the most highly-compensated cardiology physicians in the Aurora system. Despite the Aurora entities' knowledge of these physicians' procedure volume and claimed patient visits, the Aurora entities have chosen not to utilize their peer review process to remediate and prevent these false and deceptive practices.

26. **Healthcare Benefit Programs and Federal Regulations**

a. Section 24(b) of Title 18, United States Code, defines a "Healthcare Benefit Program" as "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract." Healthcare Benefit Programs (hereinafter Programs) include, but are not limited to, Medicare, Blue Cross Blue Shield, Cigna, Aetna and Government Employee Hospital Association (GEHA).

b. Medicare is a federal healthcare program that provides basic medical coverage for persons age 65 and over who are entitled to Social Security Benefits and for persons under age 65 who suffer from certain disabilities. Medicare is administered by the Centers for Medicare and Medicaid Services (CMS), an agency of the United States Department of Health and Human Services (HHS). Individuals who received benefits under Medicare were often referred to as Medicare beneficiaries.

c. Medicare is divided into Part A and Part B. Medicare Part A. covers 100% of medically-necessary inpatient hospital care, including medically-necessary testing. Medicare Part B pays for 80% of the allowed amount of medically-necessary physician services, outpatient services and other medical services. The remaining 20% of the Medicare Part B charges are to be paid by the

Medicare beneficiary, unless he or she has supplemental insurance, which would pay all or part of the 20% Medicare beneficiary co-pay.

d. Prior to participation in the Medicare Provider Program and receipt of a provider number, a provider must sign an agreement with the United States. Upon acceptance into the Program, the provider agrees to submit to certain regulations issued by the United States.

e. Upon receipt of a Provider Number, the provider may submit claims directly to Medicare. The provider agrees to accept the terms and regulations issued by Medicare and the United States. The provider attests to his/her responsibility to comply with Federal and Medicare laws and regulations on a recurring basis.

f. Medicare reimbursement requests for professional services by doctors are made on a Health Insurance Claim Form (Form HCFA 1500). Each claim form submitted for reimbursement required the diagnosis, date of service, procedure code, type of services provided, charges, name of and provider number for the physician providing the services, and a designation of the selected method of reimbursement. These forms require the provider to certify that the services on the form were medically indicated and necessary for the health of the patient and that the claimed services are true and accurate. The

form further warns that any false claim, documents, or concealing of a material fact may be prosecuted.

g. Medicare Part A claims are submitted by Aurora St. Luke's Medical Center, based on services ordered as a result of a doctors' admission and treatment of patients. These reimbursement forms are referred to as U8-92 forms or HCFA-1450 forms.

h. Physicians are required to keep patients written medical records accurately and truthfully, including descriptions of patient histories, pertinent findings. Examination results, test results, and bona fide recommendations for services and other critical information are relevant to a patient's treatment. These written medical records serve as documentary support for the claim forms submitted by a physician to the programs and could be used to review the claims.

i. Medicare pays only for services that are reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. 42 U.S.C. §1395y(a)(1 )(A).

j. Federal Regulations require that healthcare providers provide services economically, and only when, and to the extent medically necessary; are of a quality which meets professionally recognized standards of healthcare; and are supported by evidence of medical necessity and quality in such form and

fashion and at such time as may reasonably be required by a reviewing peer review organization in the exercise of its duties and responsibilities. 42 U.S.C. §1320c-5.

k. Federal regulations also recognize patient rights, including the right to make informed decisions regarding their care, the right to be free from all forms of abuse or harassment, and the right to participate in the development and implementation of his or her plan of care. 42 CFR § 482.13.

l. It is a fundamental precept of medicine that a physician should first do no harm. The physicians fiduciary duty to his patients involves providing honest and competent care. This duty includes the requirement that the doctor inform the patient of the risks, benefits, and alternatives of the proposed treatment. The doctor has the responsibility to provide adequate information the patient can understand and the appropriate atmosphere to enable the patient to provide informed consent for the procedure. Exceptions are made in bona fide emergency cases.

m. Submission of a claim to a Healthcare Benefit Program, whether it is public or private, involves representations by the provider that the services were of a quality that met professionally recognized standards which include: (1) informed consent; (2) are medically necessary; and (3) are supported by documentation of such necessity. If a provider fails to render service consistent

with these representations, the Healthcare Benefit Programs could and would deny payment.

n. The Physicians Current Procedural Terminology, commonly known as the CPT code book, contains a listing of descriptive terms and identifying code numbers for the standardized reporting of approximately 7,500 medical services and procedures performed by physicians. The purpose of the CPT code book is to provide a uniform language that accurately describes medical, surgical and diagnostic services to facilitate nationwide communications among healthcare workers, patients and others. CPT codes are used by healthcare benefit programs for tracking and processing medical claims.

27. **Scheme to Defraud**

a. Upon information and belief of the Relators, beginning on some yet to be determined date, and continuing through the present date, in the Eastern District of Wisconsin, Bajwa and Gupta did knowingly and willfully execute and attempt to execute a scheme and artifice to defraud Healthcare Benefit Programs by causing Healthcare Benefit Programs to pay for medically unnecessary procedures and to fraudulently deprive certain patients of the intangible right of honest services in connection with the delivery of and payment for health care benefits, items, and services, which programs affected interstate commerce and, in some instances, resulted in serious bodily injury.

b. Upon information and belief of the Relators, Bajwa and Gupta did knowingly and willfully execute and attempt to execute a scheme and artifice to defraud Healthcare Benefit Programs by causing Healthcare Benefit Programs to pay for medical services that were falsely documented by Bajwa and Gupta with respect to inpatient and clinic medical examinations and consultations that were not performed by the defendants.

c. Upon information and belief of the Relators, the scheme and artifice to defraud that Bajwa and Gupta devised, executed and attempted to execute included: recommending and performing medically-unnecessary angiograms (caths), contrary to generally accepted standards of practice and not otherwise in accordance with Healthcare Benefit Program requirements; falsifing medical records by falsely identifying and diagnosing the existence and extent of coronary artery disease; recording and causing to be recorded false diagnoses in patients' charts; falsely reporting and identifying stenosis in arteries.

d. Upon information and belief of the Relators, Bajwa and Gupta failed to distinguish clinically significant angina from other forms of chest pain.

e. Bajwa and Gupta failed to inform their patients about their condition by not providing accurate and complete information. Bajwa and Gupta further failed to disclose to their patients that their identification of

disease and recommendation for treatment were not based on generally accepted standards of medical practice.

28. Upon information and belief of the Relators, it was further part of the scheme and artifice Bajwa and Gupta performed medically-unnecessary angioplasty procedures and placed stents in arteries that had insignificant disease, knowing full well that such procedures were contrary to generally accepted standards of medical practice and were not performed in compliance with the requirements of federal regulations and the Healthcare Benefit Programs.

29. Upon information and belief of the Relators, it was further part of the scheme and artifice that Bajwa and Gupta placed stents in vessels with little or no stenosis, knowing full well that by doing so, this could cause restenosis of the artery, which would harm their patients and would result in additional interventional procedures to treat the restenosis, for which Bajwa and Gupta could and did seek reimbursement from the Healthcare Benefit Programs.

30. Upon information and belief of the Relators, it was further part of the scheme and artifice that Bajwa and Gupta falsely claimed that certain medical services and related medical supplies were provided to recipients in accordance with Healthcare Benefit Program agreements, when in truth and in fact, as they well knew, they were falsely billing healthcare benefit programs for medical

services that were not provided pursuant to generally accepted standards of medical practice and were not in accordance with the requirements of healthcare benefit programs.

31. Upon information and belief of the Relators, it was further part of the scheme and artifice that Bajwa and Gupta attempted to justify and to support the false and fraudulent claims that they submitted, and attempted to conceal their false representations and false fraudulent billings by taking the following actions: creating false and fraudulent records; making false entries in certain records, including falsifying cardiac cath reports by falsifying the amount of stenosis; falsifying test results; making false diagnoses; and making false entries in operative reports and other documents contained in the patients' files.

## LIABILITY UNDER THE FALSE CLAIMS ACT

32. A person (defined as any individual, partnership, corporation, associations, or private organizations) is liable under the False Claims Act for knowingly making, using or causing to be made or used, a false record or statement to get a false claim paid or approved by the government. See U.S.C. §3729(a)(2).

33. A claim is any request, demand or submission:

"Made by a recipient of money from an authority or a party to a contract with an authority, for money for services, if the United States provided any portion of the funds for the purchase of such services; provided any portion of the funds for the

purchase of services; or will reimburse such recipient or party for the purchase of such services." See 31 U.S.C. §3801(a)(3)(B).

34. A statement under the False Claims Act is:

"Any representation, record, or document made with respect to a contract with any State, political subdivision of a State, or other party, if any portion of the money under the contract comes from the Federal Government or if the Federal Government will reimburse such State, political subdivision, or party for any portion of the money under such contract." See 31 U.S.C. §3801(a)(9)(B).

## COUNT 1 AGAINST ALL DEFENDANTS FALSE CLAIMS ACT

35. Relators Ninneman and Baratta reallege and incorporate paragraphs 1 through 34 of this complaint as if fully set forth herein.

36. Upon information and belief, Aurora Health Care, Metro, Inc., d/b/a St. Luke's Medical Center, Aurora Medical Group, Inc., Aurora Cardiovascular Services, Bajwa and Gupta, personally and/or through various members and/or employees, agreed to defraud the United States and State of Wisconsin by using false statements and misrepresentations, for the purpose of obtaining payments made by the United States Government and the State of Wisconsin.

37. As set forth in the preceding paragraphs, Aurora Health Care, Metro, Inc., d/b/a St. Luke's Medical Center, Aurora Medical Group, Inc., Aurora Cardiovascular Services, Bajwa and Gupta knowingly violated 31 U.S.C. §3729(a)(2).

## COUNT II AGAINST ALL DEFENDANTS \ FALSE CLAIMS ACT PRESENTATION OF FALSE STATEMENTS

38. Relators Ninneman and Baratta reallege and incorporate paragraphs 1 through 37 of this complaint as if fully set forth herein.

39. Upon information and belief, defendants Aurora Health Care, Metro, Inc., d/b/a St. Luke's Medical Center, Aurora Medical Group, Inc., Aurora Cardiovascular Services, Bajwa and Gupta have knowingly billed for medical and cardiovascular services that do not meet the specified requirements of the American Medical Association Current Procedural Terminology (CPT) Code in order to obtain payments from the United States Government and State of Wisconsin.

40. As set forth in the preceding paragraphs, Aurora Health Care, Metro, Inc., d/b/a St. Luke's Medical Center, Aurora Medical Group, Inc., Aurora Cardiovascular Services, Bajwa and Gupta knowingly violated 31 U.S.C. §3729(a)(2), and have thereby damaged the United States Government and State of Wisconsin Government by their actions in an amount to be determined at trial.

## COUNT III AGAINST ALL DEFENDANTS \ PAYMENT UNDER MISTAKE OF FACT

41. Relators Ninneman and Baratta reallege and incorporate paragraphs 1 through 40 of the complaint as if fully set forth herein.

42. The United States and State of Wisconsin made payments to Aurora Health Care, Metro, Inc., d/b/a St. Luke's Medical Center, Aurora Medical

Group, Inc., Aurora Cardiovascular Services, Bajwa and Gupta under the erroneous belief that the statements about the scope and nature of the medical care and treatment rendered to patients of Bajwa and Gupta were consistent with the applicable CPT code. The United States' and State of Wisconsin's erroneous beliefs were material to the payments made by the Governments to Aurora Health Care, Metro, Inc., d/b/a St. Luke's Medical Center, Aurora Medical Group, Inc., Aurora Cardiovascular Services, Bajwa and Gupta.

43. As a result of these mistakes of fact, the United States and State of Wisconsin paid Aurora Health Care, Metro, Inc., d/b/a St. Luke's Medical Center, Aurora Medical Group, Inc., Aurora Cardiovascular Services, Bajwa and Gupta money to which they were not entitled and the United States and State of Wisconsin have suffered damages in an amount to be determined at trial.

**COUNT IV AGAINST ALL DEFENDANTS \ UNJUST ENRICHMENT**

44. Relators Ninneman and Baratta reallege and incorporate paragraphs 1 through 43 of this complaint as if fully set forth herein.

45. This is an action to recover monies by which Aurora Health Care, Metro, Inc., d/b/a St. Luke's Medical Center, Aurora Medical Group, Inc., Aurora Cardiovascular Services, Bajwa and Gupta have been unjustly enriched. Due to improper and fraudulent practices carried out by Aurora Health Care, Metro, Inc., d/b/a St. Luke's Medical Center, Aurora Medical Group, Inc., Aurora

Cardiovascular Services, Bajwa and Gupta the United States and State of Wisconsin paid Aurora Health Care, Metro, Inc., d/b/a St. Luke's Medical Center, Aurora Medical Group, Inc., Aurora Cardiovascular Services, Bajwa and Gupta monies by which Aurora Health Care, Metro, Inc., d/b/a St. Luke's Medical Center, Aurora Medical Group, Inc., Aurora Cardiovascular Services, Bajwa and Gupta have been unjustly enriched.

46. By reason of its payments, the United States and State of Wisconsin are entitled to damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Relators Ninneman and Baratta respectfully ask this Court to enter judgment against Aurora Health Care, Metro, Inc., d/b/a St. Luke's Medical Center, Aurora Medical Group, Inc., Aurora Cardiovascular Services, Tanvir Bajwa, M.D. and Anjan Gupta, M.D. as follows:

a. That the United States and State of Wisconsin be awarded damages in the amount of three times the damages sustained by the United States and State of Wisconsin because of the false claims and fraud alleged within this Complaint, as the Civil False Claims Act, 31 U.S.C. §3729, et seq., provides;

b. That the civil penalties of $5,500 to $11,500 be imposed for each and every false claim that Aurora Health Care, Metro, Inc., d/b/a St. Luke's Medical Center, Aurora Medical Group, Inc., Aurora Cardiovascular Services, Tanvir

Bajwa, M.D. and Anjan Gupta, M.D. presented or caused to be presented to the United States and State of Wisconsin;

c. That pre- and post-judgment interest be awarded, along with reasonable attorney's fees, costs and expenses which Relators Ninneman and Baratta necessarily incurred in bringing and pressing this case;

d. That Relators Ninneman and Baratta be awarded the maximum amounts allowed pursuant to the False Claims Act; and

e. That this Court award such other and further relief as it deems proper.

## DEMAND FOR A JURY TRIAL

Relators Ninneman and Baratta demand a jury trial on all claims alleged herein.

Dated this 24th day of May, 2013.

GIMBEL, REILLY, GUERIN & BROWN LP

By: ______________________
EMILY I. LONERGAN
State Bar No. 1070486
elonergan@grgblaw.com
Attorneys for Relators
Robert W. Ninneman and Lisa A. Baratta

POST OFFICE ADDRESS:

Two Plaza East, Suite 1170
330 East Kilbourn Avenue
Milwaukee, Wisconsin 53202
Telephone: 414/271-1440

*health/ninneman, robert/plead/quitamcomplaint 2013-05-22*